IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **HOLLIE D. PHELPS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07cv00012 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,**[1] | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further development.

*I. Background and Standard of Review*

Plaintiff, Hollie D. Phelps, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Phelps protectively filed his applications for SSI and DIB on or about September 8, 2004, alleging disability as of May 24, 2004, based on a shoulder injury and high blood pressure. (Record, ("R."), at 38-40, 47, 62, 138-40.) The claims were denied initially and on reconsideration. (R. at 26-28, 32, 33-35, 144-46.) Phelps then requested a hearing before an administrative law judge, ("ALJ"). (R. at 36.) The ALJ held a hearing on April 10, 2006, at which Phelps was represented by counsel. (R. at 171-186.)

By decision dated July 6, 2006, the ALJ denied Phelps's claims. (R. at 13-18.) The ALJ found that Phelps met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2007. (R. at 15.) The ALJ found that Phelps had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 15.) The ALJ found that the medical evidence established that Phelps had severe impairments, namely a musculoskeletal impairment, but he found that

Phelps's impairment did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ also found that Phelps retained the functional capacity to perform the exertional demands of light[2] work. (R. at 16-17.) Thus, the ALJ found that Phelps could not perform any of his past relevant work. (R. at 17.) Based on Phelps's age, education, work experience and residual functional capacity, the ALJ found that the Medical-Vocational Guidelines, found at 20 C.F.R. Part 404, Subpart P Appendix 2, ("the Grids"), directed a finding that Phelps was not disabled. (R. at 18.) Therefore, the ALJ found that Phelps was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 18.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued his decision, Phelps pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 6-8.) Phelps then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on the Commissioner's motion for summary judgment filed August 28, 2007.

## *II. Facts*

Phelps was born in 1959, (R. at 38, 138), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Phelps graduated from high school, and has past relevant work experience as a die cast machine operator. (R. at

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

-3-

63, 66.) Phelps claims that he became disabled in 2004 due to pain as a result of an industrial accident he suffered in 1996. (R. at 179.) Phelps claims he was injured in 1996 when three large pieces of steel struck him on his back, fracturing three ribs, collapsing a lung and bruising his liver. (R. at 105.) Phelps claims that he was hospitalized for approximately six days as a result. (R. at 105.) Unfortunately, the record does not contain any medical records from Phelps's initial treatment for this injury or from this hospitalization.

In rendering his decision, the ALJ reviewed records from Dr. William J. Baker, M.D.; Dr. William Humphries, M.D.; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; R. J. Milan Jr., Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Mark Simcox, M.D.; and Dr. J. Dale Sargent, M.D. Phelps's attorney also submitted additional medical records from Dr. Baker and records from the Abingdon Pain Clinic to the Appeals Council.[3]

The evidence presented contains records from Dr. Baker beginning on June 10, 1996. On June 17, 1996, Dr. Baker does not detail Phelps's injuries, but states that he was still complaining of severe pain, especially over his right rib cage. (R. at 95.) Dr. Baker noted some swelling in that area and reported that Phelps was working two hours a day. (R. at 95.) On July 1, 1996, Phelps continued to complain to Dr. Baker of right chest wall and rib cage pain. (R. at 96.) Dr. Baker noted obvious spasm and

---

[3]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

swelling with tenderness over the right rib cage area. (R. at 96.) Dr. Baker prescribed Skelaxin and continued physical therapy. (R. at 96.) Dr. Baker also urged Phelps to follow-up with his pulmonary physician regarding an uncertain lung condition. (R. at 96.)

On July 15, 1996, Dr. Baker noted that Phelps was improving. (R. at 95.) Dr. Baker noted that he agreed with the physical therapist's opinion that Phelps could begin working up to four hours a day. (R. at 95.) Dr. Baker stated that Phelps continued to complain of pain in his right upper abdominal area. (R. at 95.) Dr. Baker referred Phelps to a neurologist to address his surgeon's concern that Phelps might have suffered some peripheral nerve damage secondary to his blunt traumatic injury. (R. at 95.) Dr. Baker noted that there remained some bulging over the right upper quadrant of Phelps's abdomen, but he reported that the tenderness and bulging had decreased. (R. at 95.)

Dr. Baker noted on August 5, 1996, that Phelps was doing much better. (R. at 94.) Dr. Baker stated that Phelps was moving well and that he could not see nearly as much muscle spasm in the right upper abdominal area. (R. at 94.) Dr. Baker stated that a neurological consultative examination found that Phelps had suffered a peripheral nerve injury. (R. at 94.) Dr. Baker stated that Phelps could work four hours a day at his regular job. (R. at 94.) On August 26, 1996, Dr. Baker noted that Phelps was working four hours a day "without any problem[s]." (R. at 94.) He stated that he intended to return Phelps to work for eight hours a day after he completed his physical therapy the following week. (R. at 94.) Dr. Baker also noted that Phelps still had some swelling in the right upper quadrant of his abdomen and that Phelps's pulmonary

physician was continuing Phelps on steroid therapy for at least three more months. (R. at 94.)

On August 19, 1996, Dr. J. Dale Sargent, M.D., reported that a chest x-ray showed that Phelps suffered from diffuse pulmonary infiltrates, which biopsies had proven to be sarcoidosis.[4] (R. at 98.) In a Chart Note of the same date, Dr. Sargent stated that Phelps's sarcoidosis was moderately far advanced, although his breathing was stable. (R. at 97.) Dr. Sargent noted that Phelps's blood pressure was elevated. (R. at 97.) He also stated that, from a pulmonary standpoint, Phelps could return to work. (R. at 97.)

On September 26, 1996, Dr. Baker noted that Phelps was working 40 hours a week. (R. at 93.) Phelps complained of continuing pain in abdomen, but Dr. Baker stated that it was "pretty well stabilized." (R. at 93.) Dr. Baker stated that neurology no longer needed to treat Phelps. (R. at 93.) Dr. Baker discontinued Phelps's use of amitriptyline, as Phelps stated that he was not depressed. (R. at 93.) Dr. Baker also prescribed Monopril for Phelps's high blood pressure. (R. at 93.) On October 3, 1996, Dr. Baker noted that Phelps was working 10 hours a day. (R. at 93.) He stated that Phelps still had some pain in his abdominal area, but, overall, he was doing "pretty good." (R. at 93.) Dr. Baker increased Phelps's dosage of Monopril because of continuing high blood pressure. (R. at 93.) On October 10, 1996, Dr. Baker noted that Monopril was not working because his blood pressure was 150/110. (R. at 93.) Dr. Baker changed Phelps's blood pressure medication to Adalat. (R. at 93.)

---

[4]Sarcoidosis is a systematic granulomatous disease of unknown cause, especially involving the lungs with resulting fibrosis. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 738 (1995).

Case 1:07-cv-00012-PMS   Document 16   Filed 01/22/08   Page 6 of 15   Pageid#: 226

On December 11, 1996, Phelps returned to Dr. Sargent complaining of being short of breath. (R. at 92.) Dr. Sargent stated that Phelps's chest x-ray and pulmonary function studies were unchanged. (R. at 92.) Dr. Sargent stated that Phelps's condition appeared to be stable, although he stated that he believed that Phelps's condition was unlikely to improve. (R. at 92.) Dr. Sargent stated that he intended to taper Phelps off of steroid therapy, and he recommended that Phelps lose some weight. (R. at 92.)

The record contains a note from Dr. Baker dated January 24, 1997, which states that he believed that Phelps's industrial related injuries and scars would not improve appreciably from that point forward. (R. at 137.) The record contains no further reports from Dr. Baker until a note dated December 5, 1997, reflecting that Dr. Baker referred Phelps to an orthopedic physician for an unspecified hip injury. (R. at 91.) Dr. Baker noted that Phelps should remain off work for three more weeks. (R. at 91.)

On July 3, 2002, Dr. Baker's notes reflect that he saw Phelps for the first time in five years. (R. at 91.) Phelps complained of chronic pain in the right upper and lower quadrants of his abdomen. (R. at 91.) Dr. Baker noted that Phelps's abdomen was not tender and that his blood pressure was uncontrolled. (R. at 91.) Dr. Baker prescribed Neurontin and noted that if Phelps did not improve with this, he would refer him to an anesthesiologist for a nerve block. (R. at 91.) On August 23, 2002, Dr. Baker stated that Phelps suffered from chronic pain probably secondary to peripheral nerve injury and hypertension. (R. at 90.) Dr. Baker increased Phelps's dosage of Neurontin and referred him to Dr. Simcox, an anesthesiologist. (R. at 90.)

The next report from Dr. Baker contained in the record is dated August 4, 2004. (R. at 89.) On that date, Phelps complained of depression, insomnia and pain in his right upper quadrant of his abdomen and right lower chest wall. (R. at 89.) Phelps stated that he had not consumed any alcoholic beverages in three days, but, prior to that time, he had consumed 15 beers a day. (R. at 89.) Dr. Baker's notes reflect that Phelps was unemployed and intended to file for disability. (R. at 89.) Dr. Baker prescribed Lotrel, Ambien and Remeron, and he ordered tests to rule out pancreatitis. (R. at 89.)

On August 18, 2004, it appears that Dr. Baker performed a fairly comprehensive examination of Phelps. (R. at 88.) Dr. Baker's examination revealed nothing abnormal other than Phelps's "mildly" elevated blood pressure. (R. at 88.) Phelps complained of continuing pain in the right upper quadrant of his abdomen, but Dr. Baker found Phelps's abdomen not to be tender. (R. at 88.) Dr. Baker prescribed Lotrel and Elavil and referred Baker to Dr. Simcox for a possible nerve block. (R. at 88.) Dr. Baker also "strongly urged" Phelps to abstain from consuming any alcoholic beverages. (R. at 88.) Phelps returned to see Dr. Baker on September 8, 2004. (R. at 87.) Dr. Baker's notes reflect that Dr. Simcox had performed an epidural injection on Phelps, which Phelps stated had not helped him much. (R. at 87.)

On September 21, 2004, Dr. Baker completed a Virginia Employment Commission form stating that Phelps had been totally unable to perform any work since August 18, 2004. (R. at 104.) Dr. Baker did not indicate what, if any, restrictions he had placed on Phelps's work activity. (R. at 104.) Dr. Baker did state that he had not advised Phelps to quit his job because Phelps already had quit his job when he

returned to Dr. Baker. (R. at 104.)

Phelps saw Dr. William Humphries, M.D., for an independent medical examination at the request of the state agency on or about November 9, 2004. (R. at 105-10.) Phelps complained of severe ongoing pain in his right thorax, right anterior and posterior rib areas since an on-the-job injury approximately five years earlier. (R. at 105.) Phelps also complained of being short of breath for the past eight years and experiencing some muscle spasms in his right lower quadrant intermittently. (R. at 105.) Phelps reported consuming 10 to 12 beers on weekends. (R. at 106.) Phelps's blood pressure was 168/108 and his pulse was 135, and Dr. Humphries advised him to follow-up with his family doctor with regard to his hypertensive and tachycardic status. (R. at 106.) Dr. Humphries's findings were essentially normal except for some increased pain in the right thorax area on left and right lateral flexion of the lumbar spine, a slight reduction in the range of motion of the back, mild degenerative joint disease of Phelps's hands and moderate tenderness to palpation of the right thorax posteriorly, laterally and anteriorly. (R. at 106-07.) As a result of his examination, Dr. Humphries stated that Phelps could sit, stand and walk up to six hour in an eight-hour workday and lift items weighing up to 25 pounds occasionally and 10 pounds freqently. (R. at 107.) He further stated that Phelps could not perform overhead work. (R. at 107-08.)

The record shows that Phelps saw Dr. Mark W. Simcox, M.D., who performed an epidural steroid injection on September 1, 2004. (R. at 162-63.) Phelps complained of protracted and severe pain involving the right posterior chest wall with radiation anteriorly since his 1996 injury. (R. at 162.) According to Phelps, the pain was "quite

-9-

debilitating." (R. at 162.) Dr. Simcox saw Phelps again on October 12, 2004. (R. at 164.) Phelps stated that the previous injection had done very little to alleviate his pain. (R. at 162.) Dr. Simcox started Phelps on Cymbalta. (R. at 164.)

Phelps returned to see Dr. Simcox again on November 9, 2004. (R. at 103.) Dr. Simcox stated that Phelps reported little difference in his pain. (R. at 103.) On December 10, 2004, Phelps told Dr. Baker that his pain "might be a little better" on Cymbalta. (R. at 85.) Phelps stated that he had "cut way back on drinking," and Dr. Baker encouraged him to stop drinking. (R. at 85.) Dr. Baker continued Phelps on Lotrel, Cymbalta and Elavil. (R. at 85.) On December 30, 2004, Dr. Baker wrote that Phelps's "chronic pain condition is the same." (R. at 84.) Phelps returned to see Dr. Simcox on December 23, 2004, at which time Dr. Simcox discontinued Phelps's prescription for Cymbalta and, instead, prescribed Neurontin. (R. at 101.) On March 3, 2005, Phelps returned to Dr. Simcox and reported that his symptoms had improved somewhat on Neurontin. (R. at 100.)

On January 7, 2005, Dr. Michael J. Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment form, which Dr. Randall Hays, M.D., another state agency physician, reviewed and affirmed on March 16, 2005. (R. at 112-19.) According to Dr. Hartman and Dr. Hays, Phelps could occasionally lift items weighing up to 20 pounds and frequently lift items weighing up to 10 pounds. (R. at 113.) Phelps could stand and/or walk and sit about six hours in an eight-hour workday. (R. at 113.) Phelps's abilities to push and pull with his upper extremities and to reach were limited. (R. at 113, 115.) Dr. Hartman and Dr. Hays stated that Phelps should never climb ladders, ropes or scaffolds. (R. at 114.)

On January 11, 2005, R. J. Milan Jr., Ph.D., a state agency psychologist, completed Psychiatric Review Technique form, which was reviewed and affirmed by E. Hugh Tenison, Ph.D., another state agency psychologist, on March 16, 2005. (R. at 120-133A.) Milan and Tenison stated that Phelps did not suffer from a severe mental impairment. (R. at 120.) They also found that Phelps suffered from no restrictions of activities of daily living, no difficulties in maintaining social functioning, no episodes of decompensation and only mild difficulties in maintaining concentration, persistence or pace. (R. at 130.)

The record also contains a form completed by Dr. Baker on February 8, 2005, which states that Phelps was unable to work and that his condition was permanent. (R. at 135.) Phelps saw Dr. Simcox again on April 7, 2005. (R. at 169.) Dr. Simcox prescribed Flexeril. (R. at 169.) Phelps returned to see Dr. Simcox on September 12, 2005. (R. at 168.) Phelps stated that he had not been doing any better or any worse. (R. at 168.) Phelps stated that he had run out of Neurontin and had not noticed any change in his pain level. (R. at 168.) Dr. Simcox increased Phelps's dosage of Flexeril. (R. at 168.) Dr. Simcox also referred Phelps to the Pain Clinic for evaluation. (R. at 168.)

Phelps returned to see Dr. Simcox on April 14, 2006. (R. at 170.) Dr. Simcox again prescribed Neurontin, but stated that he had nothing else to offer Phelps in an effort to reduce his complaints of pain. (R. at 170.) Dr. Simcox suggested that Phelps consider having a diagnostic intercostal block performed. (R. at 170.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 6, 2006, the ALJ denied Phelps's claims. (R. at 13-18.) The ALJ found that Phelps met the nondisability insured status requirements of the

-12-

Act for DIB purposes through December 31, 2007. (R. at 15.) The ALJ found that Phelps had not engaged in substantial gainful activity at any time relevant to the decision. (R. at 15.) The ALJ found that the medical evidence established that Phelps had severe impairments, namely a musculoskeletal impairment, but he found that Phelps's impairment did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-16.) The ALJ also found that Phelps retained the functional capacity to perform the exertional demands of light work. (R. at 16-17.) Thus, the ALJ found that Phelps could not perform any of his past relevant work. (R. at 17.) Based on Phelps's age, education, work experience and residual functional capacity, the ALJ found that the Grids directed a finding that Phelps was not disabled. (R. at 18.) Therefore, the ALJ found that Phelps was not under a disability as defined in the Act, and that he was not eligible for benefits. (R. at 18.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Phelps argues that substantial evidence does not support the ALJ's decision. (Plaintiff's Pro Se Brief, (Docket Item No. 13.)) As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the evidence, I find that substantial evidence does not support the ALJ's finding that Phelps could perform the full range of light work. Every physician who has expressed an opinion as to Phelps's work-related abilities has found that Phelps's condition impacts his ability to work with his upper extremities. In particular, Dr. Humphries stated that Phelps could not perform any overhead work. (R. at 107-08.) While the ALJ stated that the state agency physicians found only that Phelps could not work on ladders, ropes or scaffolds, this is not accurate. Both state agency physicians also stated that Phelps could perform no overhead work and that his abilities to reach in all directions were limited. (R. at 114-15.)

## IV. Conclusion

For the foregoing reasons, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and this case will be remanded for further consideration.

-14-

An appropriate order will be entered.

DATED: This 22nd day of January 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-15-

Case 1:07-cv-00012-PMS   Document 16   Filed 01/22/08   Page 15 of 15   Pageid#: 235